# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

THE SUNSET LANDMARK INVESTMENT, LLC,

                  Plaintiff,

     v.

CHUBB CUSTOM INSURANCE COMPANY,

                  Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 17-4021-MWF (MRWx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

     This matter came on for trial before the Court sitting without a jury between May 28 and June 7, 2019.

     On May 28, 2019, Jayesh Patel appeared on behalf of Plaintiff The Sunset Landmark Investment, LLC ("Sunset") and gave an opening statement. Sunset is the corporate form of the Hollywood Athletic Club ("HAC"), the property at issue in this action. Curtis D. Parvin then appeared on behalf of Defendant Chubb Custom Insurance Company ("Chubb") and gave an opening statement.

     The following witnesses were called and examined by the parties in the order recited below:

On the same day, following opening statements, Mr. Patel examined **Saeed Nourmand**, the HAC's owner. Mr. Parvin cross-examined Mr. Nourmand; Mr. Patel conducted a redirect examination; and Mr. Parvin conduced a recross.

Next, Michael S. Wilde, appearing on behalf of Chubb, examined **William Runyan**, a licensed civil engineer self-employed for Runyan Engineer, Inc. and was retained by Chubb's insurance adjustor to produce repair plans for water damage to the HAC. Mr. Patel cross-examined Mr. Runyan and Mr. Wilde conducted a redirect examination.

On May 29, 2019, Neil Thakor, appearing on behalf of Sunset, examined **Mohamed Iravani**, the HAC's property manager. Mr. Parvin cross-examined Mr. Iravani and Mr. Thakor conducted a redirect examination.

Next, Mr. Patel examined **Dr. Jose Andrade**, Sunset's structural integrity and sulfate attacks expert. Mr. Parvin cross-examined Dr. Andrade; Mr. Patel conducted a redirect examination; and Mr. Parvin conducted a recross.

On May 30, 2019, Mr. Wilde examined **Edmon Badmagharian**, a licensed civil engineer employed by Erkel and Greenfield and Associates ("EGA") and was retained by Mr. Nourmand to conduct an assessment of the structural damages of the HAC. Mr. Patel cross-examined Mr. Badmagharian and Mr. Wilde conducted a redirect examination.

Next, Mr. Thakor examined **Jeremy Callister**, Sunset's cost estimation expert. Mr. Parvin cross-examined Mr. Callister; Mr. Thakor conducted a redirect examination; and Mr. Parvin conducted a recross.

Next, Mr. Parvin examined **Scott Richard Petersen**, Chubb's claims adjustor assigned to the HAC. Mr. Patel cross-examined Mr. Petersen; Mr. Parvin conducted a redirect examination; Mr. Patel conducted a recross; and Mr. Parvin conducted a re-redirect examination.

On May 31, 2019, Mr. Parvin examined **Scott Cushing**, a building consultant retained by Mr. Petersen to estimate reconstruction costs of the HAC. Mr. Thakor cross-

examined Mr. Cushing; Mr. Parvin conducted a redirect examination; and Mr. Thakor conducted a recross.

Next, Mr. Parvin examined **Geoff Hichborn**, Chubb's sulfate attacks expert. Mr. Thakor cross-examined Mr. Hichborn and Mr. Parvin conducted a redirect examination.

On June 5, 2019, Mr. Parvin examined **Dr. John Osteraas**, Chubb's structural integrity expert. Mr. Patel cross-examined Dr. Osteraas and Mr. Parvin conducted a redirect examination.

Next, Mr. Patel examined Dr. Andrade as a rebuttal expert. Mr. Parvin cross-examined Dr. Andrade; Mr. Patel conducted a redirect examination; and Mr. Parvin conducted a recross.

On June 7, 2019, Mr. Patel made a closing argument on behalf of Sunset and Mr. Parvin made a closing argument on behalf of Chubb. Mr. Patel also made a rebuttal argument on behalf of Sunset.

Following the presentation of evidence and the parties' closing arguments, the matter was taken under submission.

Having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law under Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I. <u>FINDINGS OF FACT</u>

### A. The Parties and the Property

1. Plaintiff Sunset is a California limited liability corporation with its principal place of business in Los Angeles. (Ex. 161). Sunset is the corporate form of the HAC, a property located at 6525 Sunset Boulevard, Los Angeles, California 90028. Mr. Nourmand testified that he is the sole owner of the HAC. Mr. Nourmand was a dignified and intelligent witness who clearly loves his beautiful building, as well he might.

Dropping the third person for a moment, as an Angeleno I'm grateful he ignored an architect's suggestion to cover the historic structure in gunite. But as explained below, neither his understandable pride of ownership nor his own training as a structural engineer allow him, in fact or law, to dictate to Chubb that the HAC be repaired to his unreasonable specifications.

2. The HAC, built in 1923, consists of several structures: (1) a nine-story tower (and the core subject of this action), (2) a two-story leased space, (3) a barrel roof gymnasium event space, (4) a club area, (5) a two-story office space, (6) a site residence, and (7) a storage building. (Ex. 161). The interior walls of the nine-story tower are made up of dry walls and hollow clay tiles ("HCTs") bound together by mortar composed of lime, sand, and Portland cement.

3. Defendant Chubb, a Delaware corporation with its principal place of business in New Jersey, is an insurance provider.

**B. The Policy**

4. Chubb issued a Commercial Property Policy (the "Policy") to insure the HAC for $10,100,000.00. (Ex. 20). In connection with the Policy, Chubb valued the nine-story tower at $6,326,288.11. (Ex. 16).

5. The Policy—in effect between July 17, 2009, and July 17, 2010—has several relevant provisions in the Building and Property Coverage Form (the "Building Coverage Form"). (Ex. 20).

6. First, Section A of the Building Coverage Form is the insuring provision and provides the scope of coverage as follows:

> We [Chubb] will pay for direct physical loss of or damage to Covered Property [*e.g.*, the HAC] at the premises described in the Declarations caused by or resulting from any Covered Caused of Loss.

(*Id.*).

7. Section A(4)(e) also describes additional coverage under the Policy where there is an increased in cost of construction incurred "to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property." (*Id.*). The additional coverage is limited to the lesser of $10,000 or 5%. The actual amount payable is available if "repairs and replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years."

8. Second, Section D of the Building Coverage Form provides that the Policy includes a $5,000 deductible. (*Id.*).

9. Third, Section E of the Building Coverage Form provides the loss conditions under the Policy. (*Id.*). Section E(4) states the loss payment options, as follows:

> In the event of loss or damage covered by this Coverage Form, at our option, we [Chubb] will either:
>
> (1) Pay the value of lost or damaged property;
> (2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below [non-coverage for increased cost attributable to enforcement of an ordinance or law];
> (3) Take all or any part of the property at an agreed or appraised value; or
> (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.
>
> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

10. Section E(7) also states the loss payment valuation, as follows:

> We [Chubb] will determine the value of Covered Property in the event of loss or damage as follows:

(1) At actual cash value as of the time of loss or damage [subject to some conditions] . . .

(*Id.*).

11.     Section E(3) further states the duties required of Sunset in the event of a loss, as follows:

> You [Sunset] must see that the following are done in the event of loss or damaged to Covered Property:
>
> . . .
> (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.
> . . .
> (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
> (8) Cooperate with us in the investigation or settlement of the claim.

(*Id.*).

12.     Fourth, Section F of the Building Coverage Form provides additional conditions that apply to the Policy, including a coinsurance obligation. (*Id.*). The coinsurance obligation states that the full amount claimed is not payable where the value of the covered property multiplied by the coinsurance percentage (or 90%) is less than the insurance limit of the property (or $10,100,000). If a coinsurance obligation applies, Chubb is required to cover an amount, pre-deductible, that is proportional to the amount the property is underinsured.

13.     In addition to physical damage to the property as set forth in the Building Coverage Form, the Policy also covers certain loss of business income as set forth in the

Business Income (and Extra Expense) Coverage Form (the "Business Income Coverage Form"). (*Id.*).

14. Section A(1) of the Business Income Coverage Form states that Chubb "will pay for the actual loss of Business Income you [Sunset] sustain due to the necessary suspension of your operations during the period of restorations" caused by direct physical loss of or damage to the HAC. (*Id.*). The limit of the business income loss is no greater than $930,000.

15. Section (C)(3) states that the amount of business income loss will be determined based on the net income of the business before the direct physical loss or damage occurred, the likely net income had no physical loss or damage occurred, the operating expenses of the HAC, and other relevant sources of information such as financial records and accounting procedures. (*Id.*). Business income, however, is reduced by the extent to which Sunset can operate, in whole or in part, the damaged or damaged portions the HAC.

16. Sections (C) and (D), similar to sections in the Building Coverage Form, provide duties required of Sunset in the event of a loss and apply a coinsurance obligation to business income. (*Id.*).

17. In addition to the Building Coverage Form and the Business Income Coverage Form, the Policy finally contains a form called the Common Policy Conditions. (*Id.*). The Common Policy Conditions exhibit provides that the Policy's terms and conditions "can be amended or waived only by endorsement issued by us [Chubb] and made a part of this [P]olicy." The Common Policy Conditions exhibit further provides that Chubb is "not obligated to make any inspections, surveys, reports, or recommendations" and that any such actions that Chubb undertakes "relate only to insurability and the premiums to be charged."

C. **The Loss**

18. At some point between the close of business on Friday, January 25, 2010, and Saturday, January 26, 2010, a galvanized water supply pipe in the southeast corner of the

tower between the eighth and ninth floor burst. Water from the burst pipe flowed from the eighth floor all the way down to the basement, primarily through a plumbing chase behind the closet wall.

19. On the morning of January 26, the maintenance crew turned off the water supply and notified Mr. Iravani, the property manager. When Mr. Mr. Iravani arrived at the HAC, he did not immediately examine all of the floors. Instead, he focused on cleaning the water that was on the first floor. On the morning of Monday, January 28, 2010, he eventually examined all of the floors for water damage.

20. Also on January 28, 2010, Sunset notified Chubb of the water damage.

**D.    The Remediation Efforts**

21. After being notified of the loss, Chubb retained Koning & Associates ("Koning"), an independent insurance adjustor, to handle the claim. On February 3, 2010, Koning visited the tower, took numerous photographs of the water damage, and prepared an estimate of the cost to restore the tower to pre-water damage condition. (Ex. 119). Koning estimated that the cost of repairing every floor, from the eighth to the basement, would total $71,742.43. Koning retained KB Construction to obtain various bids for the estimated cost of repairs.

22. Koning also recommended, which Sunset approved, that Advanced Restoration Specialists ("ARS"), a remediation company, be retained to dry out the areas affected by the water prior to repairing the walls. To dry out the affected areas, ARS performed "demolition services," which included removing some of the cement plasters on the walls with heavy equipment. As a result, some of the HCTs were damaged or were entirely taken out of the walls. ARS sent multiple status reports to Sunset and Chubb during the drying out process.

23. On February 12, 2010, ARS sent a status report indicating that it had inspected the property earlier that day, controlled demolition services were scheduled to begin on the third and fifth floor that afternoon, and work was "progressing as per our estimate and scope." (Ex. 26). ARS also indicate that controlled demolition services on

the seventh and eighth floors had been performed the previous day, on February 11, 2010. ARS finally recommended further investigation by a third-party specialized expert such as a structural engineer who has experience with concrete, brick, and mortar construction.

24. On February 17, 2010, ARS sent another status report indicating that the tower was drying well and the drying equipment was being reduced. (Ex. 27). ARS also stated that it had spoken with Mr. Iravani, who stated that most tenants were satisfied with the drying process and that he had received no complaints as to dust buildup. ARS further stated that it was still waiting on an answer as to the structural engineer to assess the integrity of the walls.

25. On February 19, 2010, ARS sent one more status report indicating that most of the exposed plaster and brick were registering dry on its moisture meters. (Ex. 28). There was no comment about conducting an assessment of the structural integrity of the walls.

26. Around the same time as ARS' status reports, Mr. Nourmand, himself a structural engineer, also requested an assessment of the structural integrity of the walls from Chubb.

27. Chubb denied the request, objected to the cost of hiring a structural engineer, and questioned the necessity of such an assessment, noting that the water damage was largely cosmetic. Both Koning and KB Construction also believed that hiring a structural engineer was not necessary and excessive.

28. At some point between February 19 and February 25, 2010, Mr. Nourmand hired Mr. Badmagharian, a structural engineer with the engineering firm EGA, to assess the structural integrity of the walls. On February 25, Mr. Badmagharian inspected the tower with ARS's representative and took numerous photos from various angles on all floors, except for the third. Mr. Badmagharian testified that in the areas that he observed, he did not see anything of concern that would make the building unsafe. He eventually produced a report on May 10, 2010, discussed beginning on paragraph 32.

29.     On February 26, 2010, ARS sent a status report to Sunset and Chubb, noting the site inspection with Mr. Badmagharian from the day prior and indicating continued progress on drying the tower. (Ex. 29). It appears that ARS completed drying out the tower in late March 2010. (Ex. 101).

30.     On April 15, 2010, ARS sent Sunset and Chubb a final report, including invoices for the work performed, status updates on the building, photographs taken during the drying out process, and psychrometric readings of the moisture on various floors. (Ex. 101). Though ARS' invoices total $94,835.51, Chubb's estimate of ARS' costs for drying out the tower (and what Chubb ultimately paid) was $91,398.09.

31.     On May 6, 2010, Sunset's insurance agent, Meslee Insurance Services, Inc. ("Meslee"), sent a letter to Chubb. (Ex. 60). In that letter, Meslee stated that while ARS advised Mr. Nourmand that the affected walls were dry and that its task was complete, Mr. Nourmand was "completely unsatisfied" with the outcome of the work. Meslee stated that the affected walls were still not dry and some affected areas smelled of unpleasant odors. Meslee also wrote that, according to Mr. Badmagharian's inspection and report, whole sections of certain walls need to be rebuilt in order to preserve the structural integrity of the tower.

32.     On May 10, 2010, Sunset sent the EGA report to Chubb. (Ex. 2). In the EGA report, Mr. Badmagharian noted that "the primary purpose of [his] visit was to make an assessment of the structural damages to the building, if any, that were caused by water and moisture due to a broken pipe on the eighth floor." Mr. Badmagharian observed the damages as follows:

> The damages were mainly to the hollow clay tile with cement plaster finish partition walls between the office, bathroom and closet area. The damages were mostly some removed cement plaster from walls, exposed hollow clay tiles with numerous locations with broken, displaced and/or missing tiles, as well as some damages to grouted joints. . . . The most severe damages that [he] observed were in the 8th, 6th, 4th, 2nd floors and the lobby

area, where not only plaster was removed but also some of the tiles were damaged, and/or missing.

Mr. Badmagharian also observed damages to the first and fifth floors, but not the third. He was not able to observe the extent of damages to the basement because the wall was covered in telephone jacks and power lines.

33. In the EGA report, Mr. Badmagharian concluded that the effect of the damaged walls on the lateral load resisting system of the tower is unclear. (*Id.*). To have an accurate evaluation, a computer model of the existing building's frames would need to be created. Mr. Badmagharian, however, recommended as follows:

> [I]n the absence and in lieu of such an extensive and expensive study and evaluation [*i.e.*, computer modeling], we [EGA] recommend that all damaged walls be repaired and reconstructed to their original condition, including removing the damaged tiles and replacing with new tiles, repairing the joints and applying new cement plaster, etc. . . . [T]he damaged walls can be replaced with similar materials that have the same weight and same shear strength and stiffness.

34. Mr. Badmagharian recommended that one possible solution to repair the damaged walls between the first to eight floors would be to replace those damaged walls with light gauge metal stud walls. (*Id.*). He did not recommend the damaged walls be replaced with solid brick or masonry walls because those are heavier and may cause further complications. At trial, he also testified that if the damaged walls were replaced with similar materials and repaired to their original condition, then no computer modeling was necessary.

35. In July 2010, Mr. Nourmand retained Robert Schwartz, an architect, to assist with project management for the repairs.

36. Shortly thereafter, in either August or September 2010, Chubb retained William Runyan, a licensed civil engineer and self-employed by Runyan Engineering, Inc.

("Runyan Engineering"), to create a bid set of plans to repair the damaged walls. Mr. Runyan inspected the tower two to four times to examine each floor of the building, except for the third, paying particular attention to water damage on each floor. He also reviewed the EGA report and the recommendation to repair the damaged walls to their original condition, and based his repair plan on this recommendation. He testified that it was not necessary to perform a structural analysis to complete his repair plan.

37. Mr. Runyan testified that for his repair plan, he did not differentiate between damages and included all signs of damage into his repair plan, whether the damage was caused by water, ARS' demolition services, an earthquake, or another source. After identifying the damages that would need to be repaired, he solicited bids from several manufacturers to come up with an estimate of how much it would cost to replace the damaged tiles and walls.

38. Mr. Runyan's repair plan went through several iterations, during which Sunset continued to express concerns about the scope of Mr. Runyan's proposed repairs. For example, on October 20, 2010, Mr. Runyan's colleague sent the following email to Mr. Schwartz:

> Robert[,] I was just speaking to [Mr.] Nourmand about the bathroom wall damage on floors 2, 4, 6 & 7 and he indicated there is also structural damage on floors 3 & 5. Runyan [Engineering] has not included those floors in the scope of work. Bill Runyan said at time of inspection floors 3 & 5 were not included as having structural damage and he did not inspect. If these two floors need to be added to the drawings please speak to Brian Peckham [of Koning] and have him notify Runyan to expand the scope.

> (Ex. 49).

39. Later on October 20, 2010, Mr. Schwartz forwarded the email to Mr. Nourmand and copied Runyan Engineering's representatives with the following response:

[Runyan Engineering] has produced a set of "bid plans" which reportedly identifies and specifies the scope of all remaining structural work in the building necessary to repair the water-damages caused by the casual event of last January. We are agreed [sic] that the technical term "structural" is limited to those physical elements of the building which are "load bearing"; that is, those elements of the building which resist gravity, seismic and live loads (i.e., the building reinforced concrete frame, deck and hollow clay tile infill panels). Conversely, the term "structural" does not include all other physical architectural building elements (finishes, fixtures and equipment) which were water-damaged by the same flooding event. . . .

It is my understanding that Bill Runyan did not specify any structural repair work on floors 5 & 3 because [Sunset] had already concealed the water-affected structural elements of the building via its own repairs undertaken with its own forces. . . .

There seems to now be some confusion about that matter and [Sunset] needs to clarify for the record whether or not it now wishes Chubb and its structural engineering consultant (Runyan Engineering) to undertake a supplementary investigation of any possibly-damaged structural building elements on floors 3 & 5 together with all of the associated destructive testing and re-repair. Please consider and advise.

(*Id.*).

40. Again, later on October 20, 2010, Mr. Nourmand responded to Mr. Schwartz with the following email:

Please advise all parties to please inspect and/or re-inspect all affected areas of the building including but not limited to 1st, 3rd and 5th floor of the building to determine the extent of the damages of the building. It is my humble opinion that the water has structurally damaged all of the walls which were soaked. I am also of the opinion that it is impossible to ascertain the extent

-13-

of the structural damage by simply visually inspecting the damaged areas.

(*Id.*).

41.    On December 20, 2010, Mr. Schwartz again raised some of the issues in an email to Runyan Engineering, stating that Mr. Runyan's repair plan seems to skip over the third floor. (Ex. 154). Mr. Schwartz also raised several other concerns, such as how to repair the HCTs and mortar joints.

42.    On December 29, 2010, based on Mr. Runyan's repair plan, Koning provided a supplemental and additional estimate of the cost of repairing the various floors as $74,859.68. (Ex. 123).

43.    On January 10, 2011, Mr. Runyan responded to Mr. Schwartz's email, stating that most of the concerns will be addressed by KB Construction's estimate. (Ex. 155). On the specific point about the third floor, Mr. Runyan stated that no documentation was submitted for review or analysis and requested that Mr. Schwartz "provide documentation of any masonry damage."

44.    Later on January 10, 2011, Mr. Schwartz responded that based upon Mr. Runyan's comments, most of the concerns identified would be addressed in the forthcoming estimate by KB Construction. (Ex. 156). This email from Mr. Schwartz appears to be the final substantive communication between the parties as to the scope of repairs until 2015.

45.    Mr. Runyan's final repair plan included the following recommendation:

ESTIMATING SCOPE OF BLOCK REPLACEMENT: FLOOR BY FLOOR

FIRST FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER.

SECOND FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER.

REMOVE AND REPLACE WITH NEW ALL CRACKED, DAMAGED OR MISSING CLAY BLOCKS. ESTIMATED QUANTITY = 10 BLOCKS.

THIRD FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER.

FOURTH FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER. REMOVE AND REPLACE WITH NEW ALL CRACKED, DAMAGED OR MISSING CLAY BLOCKS. ESTIMATED QUANTITY = 10 BLOCKS.

FIFTH FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER. REMOVE AND REPLACE WITH NEW ALL CRACKED, DAMAGED OR MISSING CLAY BLOCKS. ESTIMATED QUANTITY = 25 BLOCKS.

SIXTH FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER.

SEVENTH FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER. REMOVE AND REPLACE WITH NEW ALL CRACKED, DAMAGED OR MISSING CLAY BLOCKS. ESTIMATED QUANTITY = 10 BLOCKS.

EIGHTH FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER. REMOVE AND REPLACE WITH NEW ALL CRACKED, DAMAGED OR MISSING CLAY BLOCKS. ESTIMATED QUANTITY = 25 BLOCKS.

BASEMENT FLOOR:
REMOVE AND REPLACE WATER DAMAGED PLASTER CEILING. REMOVE AND REPLACE METAL STUDS AND DRYWALL WALLS IN THE STORAGE ROOM. REPAIR CONCRETE BEAM PER DETAIL.

ASSUMING 25% BREAKAGE OF ADJACENT BLOCKS & ASSUMING 20% BREAKAGE IN SHIPPING AND ON[-]SITE HANDLING, THE TOTAL ESTIMATED QUANTITY OF NEW CLAY BLOCKS = 130.

THE CONTRACTOR, AS PART OF VALUE ENGINEERING, MAY CHOOSE TO BID FULL DEMO AND REPLACEMENT OF BLOCK WALLS ON THE 5TH AND 8TH FLOOR. QUANTITY OF BLOCKS REQUIRED FOR THIS SCOPE WOULD INCREASE BY 45 BLOCKS ON EACH OF THE TWO FLOORS.
TOTAL ESTIMATED QUANTITY OF NEW BLOCKS = 225.

TOTAL ESTIMATED QUANTITY OF BLOCKS TO: REPLACE ALL FLOORS = 500 (INCLUDING SHIPPING AND SITE DAMAGE).

NOTES:
AFTER PLASTER REMOVAL AND REPLACEMENT OF DAMAGED BLOCK, REPOINT ANY AND WALL WATER DAMAGED MORTAR JOINTS.
PLASTER REMOVAL SHALL BE DONE WITHOUT THE USE OF POWER TOOL TO REDUCE DAMAG[E] TO BLOCKS AND MORTAR JOINTS.

(Ex. 157).

46. Following Mr. Runyan's final repair plan, Chubb paid Sunset a total of $258,454.43 for the claim, itemized as follows:

- ARS' costs for drying out the tower: $91,398.09;
- Envirocheck's costs for environmental testing: $1,075.00;
- Ford Graphics' costs for a copy of the tower's blueprints: $5,191.45;
- Koning's preliminary estimate on 2/3/10: $71,742.43;
- KB Construction's supplemental estimate #1 on 12/29/10: $74,859.68;
- KB Construction's supplemental estimate #2 on 3/22/11: $3,640.11; and

- Sunset's expenses incurred by its employees: $9,841.41;

(Ex. 112).

Based on Chubb's itemized statement, the total is actually $258,748.17, or $293.74 more than what was paid to Sunset. The parties, however, stipulated that Chubb paid **$258,454.43** on the property claim to Sunset.

47. Chubb also denied two claims as not covered under the Policy, one for $4,910.76 relating to the costs of asbestos mitigation and another for $20,864.70 relating to Mr. Schwartz's architect fees. (Ex. 159).

48. After receiving the payment from Chubb, Sunset performed repairs on the damaged walls, including filling cracks and voids in the HCTs and mortar with plaster and, where the cracks and voids were larger, filling them with wood framing and drywall. The damaged walls were then re-plastered.

### E. The Closing of the Claim

49. At some point prior to June 7, 2011, Chubb sent Sunset a status letter on the claim and a proof of loss document for any additional claims.

50. On June 16, 2011, Chubb followed up with Sunset, through Mr. Iravani, stating that Chubb has not received a response to the email on June 7 and that Chubb has received a phone call from Steve R. Segura, Esq., of Nemecek & Cole purporting to represent Sunset in this claim. (Ex. 145). Chubb stated that it cannot discuss the claim with Mr. Segura unless Sunset provides a letter of representation.

51. On June 23, 2011, Mr. Segura sent Chubb a letter of representation, advising Chubb that he represents Sunset. (*Id.*).

52. On July 11, 2011, Chubb sent Mr. Segura a letter to report on the status of the claim, as follows:

> This letter will confirm receipt of the letter of representation from you [Mr. Segura] for the above referenced insured. Sunset [] has received payment totaling $179,152.38 from the carrier for the building loss. As you are aware, [Koning] and Runyan Engineering were hired to inspect and prepare an estimate for the

covered repairs. They have identified supplement damages to the building and additional debris removal in the amount of $79,302.05 [previously issued but had not been cashed] . . . This check is being mailed to your office.

Based on the information we have the building claim has been resolved. If any additional damages are being claimed to the building please provide a detailed description along with sufficient supporting documentation for the additional damages being claimed.

(*Id.*).

In the letter, Chubb also stated that if Sunset intends to pursue loss of personal property items or business income, then Sunset should provide supporting documentation as soon as possible.

53. On November 11, 2011, Mr. Segura emailed Chubb a spreadsheet purporting to show the business income loss sustained by Sunset. (*Id.*). Mr. Segura did not attach any supporting documentation with the spreadsheet.

54. On November 14, 2011, Sunset responded to Mr. Segura to acknowledge receipt of his email. (*Id.*).

55. On December 20, 2011, Chubb sent Mr. Segura a letter, reiterating that the building claim has been resolved and that the business income claim is unsupported, as follows:

Sunset [] has received payment totaling $258,454.43 for this building loss.

Based on the information available to us, the building claim has been resolved. If any additional damages are being claimed to the building, please provide a detailed description, along with sufficient supporting documentation, for the additional damages being claimed.

. . .

We have received your November 14, 2011, communication advising of the additional claim being presented. Based on the information you provided to date, you have not sustained a business income loss as a result of this occurrence. If you are presenting a claim for Business Income loss, please submit additional documentation to support your claim for Business Income loss.

(*Id.*).

56.     Chubb sent several follow-up emails and letters to Mr. Segura, on March 23, 2012; April 12, 2012; April 30, 2012; and May 30, 2012.  (*Id.*).  In the email to Mr. Segura on May 30, Chubb wrote the following:

For more than two months, [Chubb] ha[s] been trying to obtain documents that [it] has been seeking since last November. [Chubb] sent a follow up on April 30 asking when [Sunset] would respond but received no response. It is necessary to know whether [Sunset] is pursuing the claim and, if so, that they provide the requested documents. The requested documents and information is needed before a decision on the claim can be made.

57.     On June 12, 2012, Mr. Segura sent Chubb a letter stating that (1) Sunset believed that it is entitled to an explanation of why Chubb cannot evaluate the business income claim without additional supporting documentation (*e.g.*, bank statements); (2) Sunset was unable to locate invoices for certain personal property losses; and (3) Sunset is entitled to additional payment reflecting the cost of production and installation of HCTs.  (*Id.*).

58.     On June 27, 2012, Chubb responded to Mr. Segura's letter, stating that Chubb has no documentation as to business income loss and wants to be able to fully evaluate the claim and that the additional costs for the production and installation of HCTs have already been previously paid to Sunset.  (*Id.*).

59.     Chubb then sent several follow-up emails and letters to Mr. Segura, on July 19, 2012; August 22, 2012; and August 28, 2012.  (*Id.*).  Like the previous emails and letters, these also requested additional supporting documentation on any additional building damages claimed or business income loss claimed.

60.     Between August 28, 2012, and May 4, 2015, Chubb continued to request additional supporting documentation to no avail.  (*Id.*).  Around June 2013, Mr. Segura had an accident and was substituted by his colleague, Matt Hafey, Esq., also at the law firm Nemecek & Cole.  Mr. Segura's accident may have contributed to Chubb's inability to obtain additional supporting documentation.

61.     On May 4, 2015, Mr. Hafey sent a letter to Mr. Nourmand to end his representation of Sunset due to the high hourly costs.  (*Id.*).  Mr. Hafey also suggested that it may be more cost effective for Mr. Nourmand to retain an attorney who would be willing to take the claim on a contingency fee basis.  Mr. Hafey finally advised Mr. Nourmand that any lawsuit for breach of the Policy must commence before October 6, 2015.  Mr. Hafey's withdrawal from representing Sunset may have further contributed to Chubb's inability to obtain additional supporting documentation.

62.     Mr. Nourmand testified that, during this time, he was not in a financial position to undertake any analysis and therefore was unable to provide additional documentation of the damage, since doing so would require a computer assessment of the damaged walls.  In addition, the communications between Chubb and Sunset during this timeframe—July 11, 2011, to May 4, 2015—appeared to have focused on business income loss.  (*Id.*).  The only communication related to building damages was in the letter on June 12 that concerned additional payment reflecting the cost of production and installation of HCTs.

63.     Prior to trial, the parties stipulated that any claims related to past (but not future) loss of rents or business income have been abandoned by Sunset.

### F. The Subsequent Claim

64. On October 5, 2015, Sunset filed an action against Chubb in the Los Angeles County Superior Court for breach of the Policy. (Ex. 146). Sunset then dismissed the action after the parties agreed to toll the statute of limitations in order to attempt to informally resolve the dispute.

65. After the action was dismissed, Chubb assigned the Sunset claim to a new agent, Scott Petersen. In reviewing the claim file (now more than five years old), Mr. Petersen discovered that the prior valuation—$6,326,288.11, as discussed in paragraph 4—was only for the tower portion of the HAC, not the entire property. (Ex. 16). The valuation, for instance, was done on the property with 24,000 square feet and a single address when the entire property is over 80,000 square feet with multiple street addresses. Mr. Petersen then retained Scott Cushing, a building consultant who does work on estimating reconstruction costs of buildings that have been damaged by fire, water, or other similar disasters, to perform a valuation of the entire property as of 2010.

66. Mr. Cushing testified that there was no limitations placed on how he approached the valuation of the property and that he used Marshal Swift Valuation, an estimation program, for his analysis. He divided the main property into four quadrants and valued them individually: the tower ($5,507,324), the main building ($3,295,947), the gymnasium event space ($866,621), and the club space ($4,509,872). He also valued the bungalows ($1,649,792), a storage building ($89,475), and an on-site residence ($204,167). The total value of the property is $16,123,198, but was rounded down to the nearest thousands to **$16,123,000**. To arrive at this final figure, he also made various upward and downward adjustments to the valuation, such as for sprinklers and pumps, underground utilities, an artistic mural ceiling in the main building, a balcony running track in the gymnasium, and interest carrying costs. He produced his report on August 2, 2016. (Ex. 161).

67. Mr. Petersen also requested that Mr. Cushing perform an analysis of the bids obtained by KB Construction to repair the tower and the amount paid to Sunset to

determine whether the bids and amount paid were sufficient to cover the water damage. Mr. Petersen testified that he did not request Mr. Cushing to prepare an estimate of what it would cost to repair the damage, but only to perform an analysis of whether the prior estimate was reasonable.

68. In performing his analysis, Mr. Cushing reviewed the Koning's preliminary estimate and KB Construction's supplemental estimate, conducted his own computer estimates, and used the highest estimate for any given line item. (Ex. 162). Koning and KB Construction's estimates previously totaled $146,602.11. On August 15, 2016, Mr. Cushing produced his analysis, which yielded a total estimate of $173,068.40, or a supplemental estimate of $26,466.30 from Koning and KB Construction's prior estimates. Mr. Cushing testified that he considered this supplemental estimate reasonable and "in the ballpark" of what appears to be reasonable.

69. In March 2016, Mr. Petersen also retained Dr. Osteraas, an engineer and principal at Exponent, to assess whether the repairs recommended by Runyan Engineering were adequate to address any structural issues the tower may have suffered as a result of the water. Dr. Osteraas provided his report on May 19, 2016. (Ex. 34). At trial, Dr. Osteraas testified that he visited the tower, reviewed various photographs in the EGA report that were taken by Mr. Badmagharian, and observed that some of the "abnormal conditions" in the wall appeared to have existed prior to the flooding. For instance, some of HCTs had been removed and replaced with metal stud walls prior to 2010 and many of the HTC walls had openings in them intentionally from the original construction of the tower or a subsequent renovation.

70. Dr. Osteraas also testified that neither the HCTs nor the mortar were affected by the flooding and that the HCTs do not significantly contribute to the structural integrity of the tower. He testified that the damaged walls do not contribute significantly to the structural value of the tower because they are partition walls and would fail very early in the course of seismic activity. He also testified that once these walls crack, their strength and stiffness rapidly diminish to almost zero. Dr. Osteraas finally testified that computer

modeling of the tower was unnecessary to reach his conclusions about the structural integrity of the damaged walls.

71.    On April 26, 2016, while Mr. Cushing and Dr. Osteraas were performing their respective analysis, Mr. Petersen sent a status update letter to Sunset. (Ex. 135). In that letter, Mr. Petersen indicated that Chubb (1) has paid out $258,454.43 on the claim to Sunset; (2) has sought, for a number of years, supporting documents relating to a claim of business income loss; and (3) requests that, to the extent Sunset is asserting additional benefits owed, it should complete the attached Sworn of Statement in Proof of Loss.

72.    On June 30, 2016, Sunset provided a Sworn of Statement in Proof of Loss to Mr. Petersen. (Ex. 1). In the statement, Sunset identified the damages amount and the amount claimed under the Policy was "To Be Determined." Sunset, however, provided a spreadsheet of the expenses incurred from January to December 2010, totaling $189,192.24 and less than the $258,454.43 Chubb has already paid out on the claim. No supporting documentation for any entry on the spreadsheet was provided.

73.    On August 17, 2016, Mr. Petersen responded to Sunset's letter and determined that Chubb "must respectfully reject it [the proof of loss] because it does not include information as to what amount is being claimed." (Ex. 136). Mr. Petersen also informed Sunset that the entire property is valued at $16,123,000 (per Mr. Cushing's estimate) and that the property was insured for only $10,100,000, meaning that a coinsurance penalty may apply. Mr. Petersen further informed Sunset that Chubb disagreed with Sunset's structural positions (per Dr. Osteraas' conclusions) and attached Dr. Osteraas' report. Mr. Petersen finally requested that Sunset provide detailed information to the extent it has a specific claim for damage or repair costs. It appears, but is unclear, that Sunset never responded with additional information.

74.    Instead, Sunset retained two structural engineers—Melvyn Greene of Melvyn Greene and Associates, Inc., and Dilip Khatri of Khatri International, Inc.—for structural analysis of the tower. While Mr. Khatri produced an engineering report on December 6, 2016, neither Mr. Khatri nor Mr. Greene testified at trial. (Ex. 33).

75. On March 14, 2017, when it appeared that the parties would not be able to informally resolve their disputes, Sunset commenced this action in the Los Angeles County Superior Court against Chubb for a single claim for breach of contract. On May 30, 2017, Chubb removed the action.

**G. Damages**

76. The Court's determinations of damages are findings of fact and based on the evidence. For example, while the damages experts were qualified and well-prepared, the Court views the testimony of Dr. Osteraas as more persuasively explaining the appropriate damages, based both on the evidence and California law. The Court's specific conclusions on breach of the Policy are set forth in paragraphs 18 to 20 in the Conclusions of Law.

77. Sunset's damages expert, Mr. Callister, testified that it would cost $2,069,000 (rounded to the nearest thousands) to repair the damaged walls based on a "worst case scenario." (Ex. 36). The total of $2,069,000, and a comparison to Chubb's estimate as set forth in paragraph 46, is broken down as follows:

|  | **Mr. Callister's** | **Chubb's** |
|---|---|---|
| **Interior Work** |  |  |
| Floor 8 |  | $27,822 |
| Floor 7 |  | $8,806 |
| Floor 6 |  | $234 |
| Floor 5 | $522,523 | $6,500 |
| Floor 4 |  | $7,828 |
| Floor 3 |  | $1,720 |
| Floor 2 |  | $7,336 |
| Floor 1 (Lobby) | $18,781 | $10,974 |
| Basement | $29,358 | $9,916 |
| General Items (*e.g.*, labor and disposal fees) | - | $32,526 |

| | | |
|---|---|---|
| Indirect Markups | $492,706 | $29,268 |
| Subtotal | $1,063,368 | $142,930 |
| | | |
| **Exterior Work** | | |
| Scaffolding and Repainting | $299,836 | $3,671 |
| Indirect Markups | $154,415 | - |
| Subtotal | $454,251 | $3,671 |
| | | |
| **Fees and Upgrades** | | |
| Design Fees (15%) | $227,643 | - |
| Plan Check Fees | $20,000 | - |
| ADA Upgrades (20%) | $303,524 | - |
| Subtotal | $551,167 | - |
| | | |
| **TOTAL** | **$2,068,786** | **$146,601** |

78.     Chubb's total as presented in paragraph 46—$146,602.11—and as presented here—$146,601—marginally differs due to rounding.

79.     The Court **FINDS** that Mr. Callister's estimate and testimony at trial are not convincing for the following two reasons.

80.     ***First***, Mr. Callister prepared a "worst case scenario" repair plan, rather than a reasonable or probable repair scheme.  But the weight of the testimony does not support Mr. Callister's assumptions.

81.     For instance, Dr. Andrade, Sunset's structural integrity and sulfate attacks expert, testified about his work to determine whether the interior walls had any impact on the structural performance—or stiffness—of the building.  He first reviewed the tower's structural plans and other engineering reports to build a finite element computer model.

82. In his analysis, however, Dr. Andrade lumped the interior walls together into struts and measured the impact that specific struts have on the building. (Ex. 9). He concluded that the walls can change the natural period (*i.e.*, swaying) of the building based on different scenarios (*i.e.*, no damage, one damaged wall, two damaged walls, multiple damaged walls, all interior walls removed). But Dr. Andrade's analysis did not consider any particular walls—whether damaged or not, and whether infilled or partitioned—and only looked at the "lumped" effect. Nor did he testify that he was trying to map any particular degree of damage to the tower or quantify the overall structural value. His analysis was limited to assessing the contribution (or lack thereof) of the interior walls to the structural performance of the building.

83. Dr. Andrade also testified about attempting to assess or rule out the potential for damages that were not superficial. He performed limited destructive testing by taking samples from floors 8, 7, and the basement of the building—with particular attention to the southeast corner—and testing those samples for evidence of a sulfate attack. (Ex. 10).

84. He testified that his objective was to rule out the existence of chemical damage and sulfate attacks. He stated that all of the ingredients—mortar or cement, sulfate, and water—for a sulfate attack were present, but that the timing of a sulfate attack cannot be predicted. He testified that the chemical analysis on the samples showed that the sample on the eighth floor has an elevated level of sulfate (4.5%) beyond the standard range (up to 3%–4 %).

85. Based on the results of the samples from floors 8, 7, and the basement, Dr. Andrade then conducted additional chemical analysis on samples taken from floors 2, 5, and 6. (*Id.*). One sample showed that the level of sulfate is 3.4%, which is on the boundary of being slightly elevated. He testified that none of the samples produced petrographic evidence of a sulfate attack, but because of the chemical analysis, he could not rule out the possibility of a future sulfate attack.

86. Dr. Andrade was qualified and well-prepared. He was an impressive expert who clearly explained his methodology and analysis. However, his testimony did not

make the risk of a sulfate attack seem anything than speculative.  His expertise was beside the point.  The Court **FINDS** that the testimony of Dr. Osteraas and Mr. Hichborn more persuasively explained the appropriate scope of structural damages and the potential for a sulfate attack.

87.     ***Second***, Mr. Callister exaggerated the repair scope and damages.  As one example, he not only recommended repairs on the walls identified as damaged in the EGA report, but also surrounding walls since those are "potentially" damaged despite any evidence indicating so.  (Ex. 36).  He further recommended completely removing and replacing all of the damaged walls and potentially damaged walls.

88.     As another example, Mr. Callister recommended scaffolding the entire tower, replacing the exterior (*i.e.*, street-facing) walls in their entirety on every floor, and then repainting the entire tower, at a cost of $454,251.  (*Id.*).

89.     As a further example, Mr. Callister included markups of more than 100% on the total cost of repair, whereas Chubb only included approximately 20% since many of the contingencies Mr. Callister accounts for have already been addressed in the underlying bid by the contractors.  (*Id.*).

90.     As yet another example, Mr. Callister estimated that the costs for ADA upgrades to total $303,524, or 20% of the repair costs.  (*Id.*).  But section A(4)(e) of the Building Coverage Form, described in paragraph 7, limits the cost of construction "in the course of repair, rebuilding or replacement of damaged parts" to the ***lesser*** of $10,000 or 5%.

91.     Because the weight of the testimony does not support Mr. Callister's assumptions of a "worst case scenario" repair plan and because he overstated the repair scope and damages, the Court **FINDS** that Sunset is not entitled to the requested $2,069,000.

92.     A more difficult issue is the basement, for which Chubb did provide an estimate and paid accordingly.  Sunset seeks costs totaling $268,000 relating to the basement, primarily for removing a panel containing the telephone jacks and power lines

in order to repair the damaged walls. The support for this figure was Mr. Nourmand's testimony at trial, which was not seriously cross-examined. However, Sunset provides no support or evidence for this request. It appears that the basis for the request was Mr. Nourmand's own belief that any theoretical – indeed, speculative – future risk had to be eliminated, which is an accurate description of his unfounded fear of a future sulfate attack. While it might be that Sunset might have deserved more money that Chubb's estimate given the unique nature of the basement, the Court is left in the position of choosing either Chubb's estimate or the $268,000. On this record, the Court has no choice but to **FIND** that Sunset is not entitled to the requested $268,000.

93. The Court, however, **FINDS** that Chubb's estimate of repairs of the third and sixth floors—totaling $1,954—is insufficient. The third floor, for instance, was not examined for damages. Mr. Runyan's final repair plan also did not include recommended repairs for the sixth floor even though damages were observed. (Ex. 157).

94. The Court instead will assign the repair costs to the third and sixth floors an additional **$7,618**, or the average of the costs of the repairs for the other floors (except for the eighth, lobby, and basement). The total cost of repairs is therefore $146,601 + $7,618 + $7,618 = **$161,837**.

95. The Court also **FINDS** other costs calculated by Chubb, totaling **$111,146**, are appropriate. These costs include ARS's costs for drying out the tower, costs for environmental testing and blueprints, and other costs incurred by Sunset.

96. The Court further **FINDS** that the total amount of damages related to repairing the damaged walls to which Sunset is entitled is $161,837 + $111,146 = **$272,983**.

97. Sunset finally seeks loss future business income totaling $930,000. Sunset arrives at this figure because Mr. Nourmand testified that it would take approximately 18 months to reoccupy the tower and Mr. Iravani testified that the properly is normally at 80% occupancy and generates approximately $8,500 in rent per floor per month. At trial,

Mr. Iravani also testified that many of the tenants were relocated to the empty 9th floor during the demolition services and drying out process.

98.     Under the Policy, loss of business income is reduced to the extent Sunset can operate, ***in whole or in part***, the damaged or undamaged portions of the HAC.  (Ex. 20). Sunset's proposed future business income loss, however, appears to be inappropriately assuming that no portion of the tower may be used during repair.

99.     Accordingly, the Court **FINDS** that Sunset is not entitled to the requested $930,000.

## II.     CONCLUSIONS OF LAW

1.     The Court concludes that Sunset has failed to prove that Chubb breached the Policy by failing to (1) adequately investigate the structural damage in the affected areas; (2) fully compensate Sunset for the non-structural repairs; and (3) repair the structural damage to the areas damaged by water.

### A.     Relevant Legal Principles

2.     To prevail on a breach of contract claim, a plaintiff must establish: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach of either express or implied terms of the contract, and (4) damage to plaintiff.  *Abdelhamid v. Fire Ins. Exchange*, 182 Cal. App. 4th 990, 999, 106 Cal. Rptr. 3d 26 (2010).

3.     "Every contract imposes upon each party a duty [or covenant] of good faith and fair dealing in its performance and its enforcement."  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683, 254 Cal. Rptr. 211 (1988) (affirming dismissal of an employee's claim for relief alleging a tortious breach of the implied covenant of good faith and fair dealing).  "There are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause."  *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 278, 37 Cal. Rptr. 3d 434 (2005) (holding that the insured could not state a claim for breach of the implied

covenant without showing the withholding of a benefit that was in fact due under the contract).

4.    As preliminary matter, Sunset did not assert a claim for a breach of the implied duty of good faith and fair dealing.

5.    Regardless, an insurer "must give at least as much attention to the [insured's] interests as it does its own," and "cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 819, 169 Cal. Rptr. 691 (1979) (holding that where undisputed evidence showed that the insurer failed to properly investigate the insured's claim, the court properly held that a breach of the implied covenant was established as a matter of law).

**B.    Failure to Adequately Investigate**

6.    An insurer fails to fulfill its duty to investigate if, when presented with credible expert opinions suggesting that the claim is covered, it ignores those facts without any attempt at adequate investigation, and reaches contrary conclusions without any scientific foundation. *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 753, 68 Cal. Rptr. 3d 746 (2007) (holding that insured had raised triable issue of fact as to whether insurer breached the covenant of good faith by failing to investigate insured's claim, where insured had presented medical evidence of degenerative spine disease resulting from trauma, and the insurer denied the claim without conducting any investigation on the basis of the unfounded opinion that the insured suffered from a preexisting degenerative disorder).

7.    "An unreasonable failure to investigate . . . may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages." *Shade Foods, Inc. v. Innovative Product Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 880, 93 Cal. Rptr. 2d 364 (2000) (holding that insurer's rapid closing of the file after little investigation and failure to develop a plausible theory of the cause of a loss supported the jury's finding of bad faith liability); *Mariscal v. Old Republic Life Ins. Co.*,

42 Cal. App. 4th 1617, 1624, 50 Cal. Rptr. 2d 224 (1996) (holding that insurance company breached covenant of good faith when it ignored medical evidence that insured died of accident and based its denial of coverage solely on evidence suggesting that insured may have died of illness).

8.    On the other hand, the insurer is generally protected from bad faith liability where there is a genuine issue as to coverage. *See Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992–93 (9th Cir. 2001). The "genuine issue" doctrine may be raised when the genuine dispute is legal, regarding whether a particular claim is covered under the policy, or when the dispute is factual. *Id.* at 994–95 (holding that factual dispute as to whether insured had lost all items she had claimed to lose in fire, supported by investigation by experts who concluded that few of the items were present in the fire wreckage, protected insurer from bad faith liability).

9.    Likewise, an insurer is generally protected from bad faith liability when it relies on the opinions of independent experts. *See Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1291, 97 Cal. Rptr. 2d 386, 391 (2000) (holding that the parties' experts' dispute over the proper cost of repairs following a fire protected the insurer from bad faith liability, even when a substantial disparity existed between the experts' opinions).

10.    As an initial matter, and as previously noted, Sunset did not assert a claim for breach of the covenant of good faith and fair dealing. But a defendant's "alleged breach of its duty to investigate relates to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing rather than its breach of contract claim." *See Onder v. Allstate Ins. Co.*, No. 02-CV-213-IEG, 2002 WL 1354826, at *7 (S.D. Cal. June 12, 2002) (granting summary judgment in favor of the defendant on the plaintiff's claim for breach of contract because "disputed facts going to the bad faith issue are not relevant" and the plaintiff "cannot show a genuine issue of material fact with respect to their breach of contract claim by contending that defendants failed to investigate") (citing *Frommocthelydo v. Fire Ins. Exch.*, 42 Cal. 3d 208, 220, 228 Cal. Rptr. 160 (Cal. 1988)).

11.     Regardless, the Court **CONCLUDES** that Chubb did not breach an express or implied duty to investigate the water damage.

12.     The Policy states that Chubb "will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition," which in turns requires Chubb to "determine the value of Covered Property in the event of loss or damage . . . [a]t cash value as of the time of loss or damage." (Ex. 20). The express language does not mandate an investigation and instead refers to how lost or damaged property is valued and by whom in the event of a loss.

13.     The Policy further expressly states that Chubb is not obligated to make any inspections, surveys, reports, or recommendations, and any such actions would relate only to insurability and the premiums to be charged. (*Id.*).

14.     In addition, the weight of the testimony at trial is that Chubb adequately investigated the water damage. Sunset notified Chubb of the loss on January 28, 2010, and within approximately one week, Chubb and its agents performed substantial remediation efforts on the HAC.

15.     For example, Koning visited the HAC and took photos of the water damage. In addition, ARS, the remediation company recommended by Koning and retained by Sunset, visited the HAC with Mr. Nourmand. There, ARS inspected every floor for water damage, subsequently began drying out the water, and performed chemical testing for asbestos. By the end of February 2010, ARS also had finished performing controlled demolition services on several floors in order to fully dry out the damaged walls.

16.     Moreover, Chubb denied performing computer analysis and questioned the necessity for that analysis *after* relying on Koning and KB Construction's opinion that a computer analysis was excessive. Mr. Badmagharian's opinion in the EGA report later agrees that computer modelling was not required so long as the damaged walls were repaired to their original condition by replacing damaged HCTs, repairing damaged joints, and applying new cement plaster thereafter.

17.     The weight of the testimony is that Chubb considered the relevant evidence and recommendations by numerous sources to arrive at its conclusion to deny Sunset's requested computer analysis, a decision that is adequately supported by the record. *See, e.g.*, *Morello v. AMCO Ins. Co.*, 650 Fed. App'x 522, 523 (9th Cir. 2016) (concluding that, under California law, "[t]here is no substantial evidence that AMCO engaged in an unreasonable investigation" by undertaking "persistent efforts to obtain information from [the plaintiff] and employ[ing] experts to review the evidence," and that "it is inconsequential that in hindsight there may have been other avenues to explore").

### C.     Failure to Fully Compensate for Non-Structural and Structural Repairs

18.     As an initial matter, the Court will address both non-structural and structural repairs together because the evidence is largely overlapping.

19.     Here, the Court **CONCLUDES** that Chubb did breach the Policy by failing to fully compensate Sunset for non-structural and structural repairs. As discussed in paragraphs 76 to 99 of the Findings of Fact, Chubb's estimate of repairs of the third and sixth floors—totaling $1,954—is insufficient.

20.     To the extent Sunset argues that it is entitled to more damages that $272,983, the Court disagrees. Sunset's argument hinges largely on the fact that for the non-structural repairs to be completed, the repair plan needed to be submitted and approved by the City of Los Angeles. But this is contrary to the weight of the testimony. For instance, Mr. Badmagharian testified that repairs constituting less than 5% of a building, like here, would not need a major analysis (*i.e.*, computer or structural modeling) or the City's approval. Mr. Petersen's testimony is largely consistent with Mr. Badmagharian's conclusion.

### D.     Coinsurance Penalty

21.     As an initial matter, Sunset is entitled to $272,983 (per paragraph 96 in the Findings of Fact) and only received $258,454 (per paragraph 46 in the Findings of Fact). In theory, Sunset should be entitled to additional damages in the amount of $272,983 – $258,454 = $14,529.

22.     The Court, however, **CONCLUDES** that the coinsurance provision of the Policy precludes Sunset from recovering the additional $14,529.

23.     As discussed above, Mr. Cushing valued the replacement cost of the entirety of the HAC at $16,123,000.  (Ex. 161).  Because the Policy has a maximum limit of only $10,100,000, the coinsurance penalty is [$10,100,000 / ($16,123,000 * 0.9)] = 0.696 or 69.6%.  The total damages that Sunset must have incurred in order to avoid a coinsurance penalty is calculated using the formula [(damages already paid + deductible) / coinsurance penalty ratio], or [($258,454 + $5,000) / 0.696] = **$378,526**.

24.     Sunset argues that the coinsurance penalty does not apply.  According to Sunset, Chubb has waived its right to rely on the coinsurance provision of the Policy because the value of the property could have been determined with a reasonable investigation and because Mr. Cushing's analysis is unreliable.

25.     Parties may, by their words or conduct, waive contractual rights.  *See Galdjie v. Darwish*, 113 Cal. App. 4th 1331, 1339, 7 Cal. Rptr. 3d 178 (2003) (concluding that "[l]ike any other contractual terms, timeliness provisions are subject to waiver by the party for whose benefit they are made").  "[T]he pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right."  *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 678, 95 Cal. Rptr. 2d 583 (2000) (concluding that an insurer's request for jury trial on the issue of whether it waived a right to reimbursement from the insured for defense and settlement costs should have been granted).

26.     "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right.  Thus, California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished."  *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78, 215 Cal. Rptr. 3d 835 (2017) (reversing the district court's grant of summary judgment as to waiver where there is evidence of "oral tolling agreements, the

prior failure to enforce the incontestability clause, and the chronic delays in the audit process") (internal quotation marks and citations omitted).

27.     The only non-testimonial evidence supporting a waiver of the coinsurance provision are two status reports sent to Sunset—one on February 19, 2010, and another on March 29, 2010—stating as follows:

> According to the attached XactValue, the complex has an estimated replacement value of $6,326,288.11.  Based on these figures, the building complex is currently over insured.

(Ex. 16).

28.     As noted above, when the claim was assigned to Mr. Petersen, he reviewed the claim file and instantly noticed that the prior valuation of $6,326,288.11 pertained only to the tower portion of the HAC rather than the entirety property.  (*Id.*).  Indeed, the very reports sent to Sunset indicated that the valuation was performed on the property with 24,000 square feet (*i.e.*, the tower) rather than a property with 80,000 square feet (*i.e.*, the entire complex).  Far from intentionally relinquishing the coinsurance provision, Mr. Petersen then retained Mr. Cushing to perform a valuation of the entire property as of 2010.

29.     There is no non-testimonial evidence to suggest that Chubb, with complete knowledge of all relevant facts, acted with the intent to give up its coinsurance rights.  Rather, it appears that Chubb corrected a third-party adjuster's inadvertent mistake.  *See, e.g.*, *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 32–34, 44 Cal. Rptr. 2d 370 (1995) (affirming judgment in favor of insurer and concluding that "an insurer does not impliedly waive coverage defenses it fails to mention when it denies the claim"); *Udinsky v. State Farm Fire and Casualty Co.*, No. 18-CV-3994-JSC, 2019 WL 1017606, at *9 (N.D. Cal. Mar. 4, 2019) (applying California law and concluding that an assigned adjustor's "mistake, which resulted in payment of over $24,000 that Plaintiff was otherwise not entitled to under the Policy, does not constitute a waiver").

### III. <u>VERDICT</u>

On Sunset's claim for breach of contract, the Court **FINDS** and **RULES** in favor of Chubb.

The Court will enter a separate judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b).

Dated: August 29, 2019

_____
MICHAEL W. FITZGERALD
United States District Judge